# In the United States Court of Federal Claims

No. 16-353C (Bid Protest)

(Filed Under Seal: June 30, 2016 | Reissued: July 18, 2016)[*]

| | |
|---|---|
| DYNAMIC SYSTEMS TECHNOLOGY, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| INTERACTIVE GOVERNMENT HOLDINGS, INC., | ) ) ) |
| Defendant-Intervenor. | ) ) ) |

Keywords: Post-Award Bid Protest; Judgment on the Administrative Record; Technical Evaluation; Past Performance Evaluation; Best-Value Determination

*James S. DelSordo*, Argus Legal, PLLC, Manassas, VA, for Plaintiff. *James S. Phillips* and *Julie M. Nichols*, Argus Legal, PLLC, Of Counsel.

*Michael D. Austin*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, with whom were *Douglas Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant. *Hattie DuBois* and *William Moorhouse*, Defense Human Resources Activity, Of Counsel.

*David E. Fletcher*, Cooley, LLP, Washington, DC, for Defendant-Intervenor. *Christopher J. Kimball* and *Erin M. Estevez*, Cooley, LLP, Of Counsel.

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. Neither party requested redactions, and the Opnion is now being reissued in full.

## OPINION AND ORDER

**KAPLAN, Judge.**

This post-award bid protest concerns a contract with the Defense Human Resources Activity (DHRA) to provide comprehensive support services for its Family Employer Programs and Policy (FEPP) initiative. After DHRA awarded the contract to Defendant-Intervenor Interactive Government Holdings, Inc. (IGH), Plaintiff Dynamic Systems Technology, Inc. (DysTech), a disappointed offeror, filed this action. DysTech asserts that the agency improperly evaluated the technical and past performance aspects of IGH's proposal, and that it erred when it determined that IGH's proposal offered the best value to the government.

Pending before the Court are the parties' cross-motions for judgment on the administrative record. For the reasons set forth below, the government's and the Intervenor's cross-motions for judgment on the administrative record are **GRANTED**, and DysTech's cross-motion is **DENIED**.

## BACKGROUND

### I.     The Solicitation

DHRA is an agency within the Department of Defense. Its mission is to "enhance[] the operational effectiveness and efficiency of diverse programs supporting the Department of Defense" by "develop[ing] products and services that promote and sustain a high performing workforce." See Dep't of Defense, Directive No. 5100.87 (Feb. 19, 2008) at 2 ¶ 3. Among many other programs, DHRA administers FEPP, which provides dedicated support services for members of the armed services reserves and the National Guard. See Administrative Record (AR) Tab 2 at 10; FEPP, Manpower and Reserve Affairs, http://www.people.mil/Deputates/FamilyEmployerProgramsPolicy.aspx (last visited June 29, 2016). FEPP has three major components: the Employer Support of the Guard and Reserve (ESGR); the Yellow Ribbon Reintegration Program (YRRP); and the Employment Initiative Program (EIP). AR Tab 2 at 10. Through these programs, DHRA aims to help National Guard and Reserve members balance the demands of civilian employment and military life. See Who Is ESGR, Employer Support of the Guard and Reserve, http://www.esgr.mil/About-ESGR/Who-is-ESGR/What-is-ESGR.aspx (last visited June 29, 2016); About, Yellow Ribbon Reintegration Program, http://www.yellowribbon.mil/yrrp/ (last visited June 29, 2016).

On October 19, 2014, DHRA issued a solicitation seeking offers from contractors to provide comprehensive support services for FEPP. AR Tab 1 at 1. In particular, the contractor would "[p]rovide all personnel management, materials, and equipment necessary to provide the FEPP and its major components with program administrative, logistical, and technical support and subject matter expert services." AR Tab 2 at 10. The heart of the solicitation was a twenty-five-page performance work statement (PWS) spelling out the contract's requirements in great detail. Id. at 10–34.

Offerors' proposals were to include three volumes: business, technical, and price proposal. Id. at 35–36. The technical volume was to be broken into three parts. First, offerors were to include a technical proposal "address[ing] the technical requirements of the Performance Work Statement (PWS) and Evaluation Factors." Id. at 36. Next, offerors were to "submit up to five relevant and recent past performance references." Id. Finally, offerors were to provide a quality control plan. Id.

DHRA informed offerors that it would evaluate their proposals based on three factors: technical, past performance, and price. Id. at 72–74. For the technical factor, DHRA would assess three elements: technical approach and methodology, project management plan, and quality control plan. Id. at 73–74. In terms of technical approach and methodology, the solicitation explained that "[b]y addressing each portion of the PWS, proposals shall describe the offeror's understanding of the requirement, assessment of the objectives to be accomplished, [and] methodology for accomplishing the requirement." Id. at 73.

Offerors' technical proposals would be assigned one of four adjectival ratings: outstanding, acceptable, marginal, or unacceptable. Id. at 74–75. As pertinent to the issues in this case, under the solicitation an "outstanding" technical proposal:

> [E]xceeds stated requirements, as reflected through an innovative, comprehensive, outstanding approach. The response is complete in terms of the basic content and level of information the Government seeks for evaluation. There is a high probability of success and minimal risk that this Offeror would fail to meet the quantity, quality, and schedule requirements. Minor weaknesses, if any, need not be corrected to make award.

Id. A technical proposal would be rated "acceptable" where:

> The proposal meets the stated requirements. The response is considered complete in terms of the basic content and level of information the Government seeks for evaluation. There is a reasonable probability of success and little risk that this Offeror would fail to meet the quantity, quality, and schedule requirements. Minor weaknesses, if any, may not need to be corrected to make award.

Id. at 75.

For past performance, the solicitation informed offerors that "[t]he Government will conduct a performance confidence assessment based upon the past performance of major or critical aspects of the requirement as it relates to the probability of successfully performing the solicitation requirements." Id. at 74. Past performance would be rated along several dimensions.

First, offerors' past performance references would be evaluated for relevancy. According to the solicitation, "[i]nformation regarding contract performance that is

recent[1] and has a logical connection with the matter under consideration indicates relevancy." Id. at 73. Applying that standard, each example of past contract performance would be assigned one of four "relevancy" ratings: very relevant, relevant, somewhat relevant, or not relevant. Id. at 75. An offeror's "past/present performance effort" would be rated "very relevant" where it "involved essentially the same magnitude of effort and complexities this solicitation requires." Id. A "relevant" present/past performance effort would "involv[e] much of the magnitude of effort and complexities this solicitation requires." Id. An offeror's "past/present performance effort" would be rated "somewhat relevant" where it "involved some of the magnitude of effort and complexities this solicitation requires." Id. Finally, a past/present performance effort was "not relevant" where it "did not involve any of the magnitude of effort and complexities this solicitation requires." Id.

Thereafter, based on "[t]he combination of relevancy and recency," along with evidence of performance documented by information gathered by the government, DHRA would assign the offer as a whole a "performance confidence" rating. Id. at 75–76. The available performance confidence ratings were substantial confidence (i.e., "the Government has a high expectation that the offeror will successfully perform the required effort"), satisfactory confidence (i.e., "the Government has an expectation that the offeror will successfully perform the required effort"), limited confidence (i.e., "the Government has a low expectation that the offeror will successfully perform the required effort"), no confidence (i.e., "the Government has no expectation that the offeror will successfully perform the required effort"), or unknown confidence (i.e., "[n]o relevant past performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned"). Id.

Finally, to decide which offeror would receive the award, the solicitation explained that the government would "us[e] the trade-off approach" to determine which proposal represented the "best value to the Government." Id. at 74. When conducting this trade-off, the technical factor would be considered the most important one, followed by past performance and price. Id. The solicitation further specified that, when combined, technical and past performance would be considered "significantly more important than cost or price." Id.

## II.   Offers, Evaluation, and Award[2]

### A.   Review by the Technical Evaluation Board

DHRA received seventeen offers. See AR Tab 24 at 582–83; AR Tab 35 at 691–92. It convened a Technical Evaluation Board (TEB), which reviewed the offerors'

---

[1] "Recency refers to the state or quality of being current." AR Tab 2 at 73. "The more recent the contract, the greater likelihood that the offeror has the capacity to perform in a like manner." Id.

[2] DHRA initially awarded the contract to IGH on April 1, 2015, after which several offerors protested before the Government Accountability Office (GAO). Def.'s Cross-

technical proposals and past performance references. See AR Tab 24. The TEB assigned each technical proposal an adjectival rating. Id. at 582–83. IGH's technical proposal was rated "outstanding." Id. at 582–84. The TEB found that IGH's proposal "include[d] numerous strengths and exceed[ed] the stated solicitation requirements in most areas, as reflected by creative and innovative approaches." Id. at 583. It noted five particular strengths in IGH's proposal, including: (1) an emphasis on the individual development of each support staff member and the use of a mentor/protégé program to "maximize the FEPP mission in assisting service members and employers;" (2) a program for soliciting feedback and using it to implement program improvements; (3) the use of assessments during the hiring process, which would be advantageous to the government because it would ensure a baseline level of competence and "eliminate[] time spent during a learning curve phase;" (4) the establishment of a dedicated advisory board consisting of senior leadership to "anticipate upcoming challenges and introduce new concepts and ideas to the Government for consideration;" and (5) an "integrated management approach" designed to create "synergy" among FEPP's three main components. Id. at 583–84. The TEB concluded on the basis of the strengths of the proposal that "[t]here is a high probability of success that [IGH] would meet the quantity, quality, and schedule requirements." Id. at 583.

DysTech's technical proposal received an "acceptable" rating. Id. at 585. The proposal was considered "complete in terms of basic content," and it demonstrated "a reasonable probability of success." Id. The TEB identified two particular strengths and no weaknesses. Id. The identified strengths were DysTech's plans (1) to train and test each Employment Coordinator using webinars, which would "give[] high confidence to the government that the [Employment Coordinators] will be more than technically proficient;" and (2) to use instructors from the National Veterans Training Institute and the Transition Assistance Program, plus outside instructors and others, to provide annual Employment Coordinator counseling regarding the latest new trends and research in the counseling arena. Id. The TEB concluded that DysTech's proposal reflected "a reasonable probability of success and little risk that [DysTech] would fail to meet the quantity, quality, and schedule requirements." Id.

The TEB then reviewed the offerors' past performance references and assigned a relevancy rating to each. Id. at 603–10. As discussed in greater detail below, IGH submitted three past performance references, each of which was rated "somewhat relevant." Id. at 603–04. DysTech submitted four past performance references: one was rated "relevant," and the other three were rated "somewhat relevant." Id. at 605.

---

Mot. for J. Upon the Admin. R. and Opp'n to Pl.'s Mem. in Supp. of Its Mot. for J. on the Admin. R. (Def.'s Mot.) at 4, ECF No. 24. The GAO sustained the protests and recommended that DHRA correct the flaws it identified and reevaluate the proposals. Id.; see also AR Tabs 45–46. Following the GAO's decision, the agency "conduct[ed] an entirely new evaluation." Def.'s Mot. at 4. Thus, the discussion that follows concerns only DHRA's reevaluation of the proposals following the first GAO bid protest.

5

B.      **Review by the Contract Specialist**

After the TEB's evaluation, a DHRA contract specialist (CS) independently reviewed the offerors' past performance references and made performance confidence assessments. AR Tab 35. These assessments were based on the recency, relevancy, and dollar value of the offerors' previous contracts, along with information about the offerors' past performance found in (1) the government's Past Performance Information Retrieval System (PPIRS) and (2) questionnaires completed by the references themselves. See id. at 691–92, 701.

The CS gave IGH a "satisfactory confidence" rating, indicating, as described above, an expectation that it would "successfully perform the required effort." Id. at 705. Two of IGH's references completed questionnaires, and the CS determined that the responses provided established that IGH's performance was "Satisfactory" with respect to seven of the total eight elements examined, and "Neutral" as to one element. Id. There was no information about IGH's past contracts in the PPIRS. Id. In total, the dollar value of IGH's previous contracts amounted to less than $600,000. Id. at 705. The CS observed, however, that "[a]lthough the magnitude of the references are below that of the overall FEPP requirement, IGH has performed efforts that collectively involve much of the complexities of the FEPP requirement." Id. Thus, the CS concluded that "[t]he Government has an expectation that IGH will successfully perform . . . should they receive the award." Id.

DysTech also received a satisfactory confidence rating. Id. at 707. Only one of DysTech's references completed a questionnaire, and the CS determined that the responses established "Satisfactory" performance. Id. The PPIRS also had information about two of DysTech's previous contracts, for which it received ratings of "Satisfactory" and "Very Good." Id. The dollar value of DysTech's previous references added up to nearly $54 million. Id. According to the CS, DysTech's past performance information "g[ave] the Government an expectation that [DysTech] will successfully perform the required effort." Id.

C.      **Review by the Contracting Officer and Award Recommendation**

Following the CS's assessment, and after reviewing all the available information, the CO conducted a trade-off analysis to determine which offer represented the best value to the government. AR Tab 36. IGH priced its offer at about $48.9 million, making it the highest-priced offer DHRA received. See id. at 759. DysTech priced its offer at about $38.2 million. Id. The CO determined that both these prices were within the range of "fair and reasonable." See id. at 757.

In the first step of the trade-off analysis, the CO found that of the five offers receiving "acceptable" technical ratings, DysTech's offer provided the best value to the government. Id. at 760–61. She then compared DysTech's offer to IGH's offer, which had received an "outstanding" technical rating. Id. at 761–62. After noting that IGH's offer and DysTech's offer both received "satisfactory" performance confidence ratings, the CO listed several ways in which IGH's proposal offered additional concrete benefits

to the government. Id. Specifically, the CO noted that IGH planned to provide its staff members with individualized, high-touch trainings; that it would "collect regular feedback . . . in an attempt to facilitate constant improvement;" that it would screen for employees with skills that the government required; and that it would create a leadership board within FEPP, which would "provide an additional resource to meet the needs of reserve component service members who require specialized assistance." Id.

Thus, in light of the "significant value IGH's proposal offer[ed]," the CO decided that IGH's "28% higher price premium" was "warranted." Id. at 762. Accordingly, the CO recommended awarding the contract to IGH. Id.

### D.       Review by the Source Selection Authority and Contract Award

Following the CO's review, the agency's source selection authority (SSA) conducted a "factor-by-factor, independent assessment" of the proposals to determine the contract award. See AR Tab 37 at 763. Upon reviewing the offerors' technical, past performance, and price submissions, she found that "IGH's superior proposal warrant[ed] a price premium, particularly [because] IGH's proposal [was] the sole technically superior proposal, and so greatly exceeded all of the acceptably rated proposals." Id. at 767. Accordingly, she awarded the FEPP contract to IGH. Id. at 767–68.

## III.    GAO Protest

Following the award, DysTech and two other offerors, TENICA and Associates, LLC and TEK Source USA, Inc. filed protests with the Government Accountability Office (GAO). See AR Tab 47. Before the GAO, DysTech argued that the CO erred by (1) rating its technical proposal "acceptable" rather than "outstanding;" (2) rating three of its past performance references as "somewhat relevant" rather than "relevant;" (3) giving IGH a past performance rating of "satisfactory confidence" despite the small dollar value of its past performance references relative to the scope of the contract; and (4) failing to properly conduct the trade-off analysis when assessing the offerors' prices. Id. at 898–99, 902–06.

The GAO denied the protests on March 2, 2016. Id. at 907. It found "no basis to question" the CO's determination that DysTech's technical proposal did not "exceed[] [the] stated requirements, as reflected through an innovative, comprehensive, outstanding approach." Id. at 898 (internal quotation omitted). Nor did it find a basis to question the CO's decision to rate its past performance references as "somewhat relevant." Id. at 902. The GAO also rejected the protesters' view of the CO's responsibility in assessing IGH's past performance references—i.e., that she should have based the ratings "solely on magnitude—dollar value—of past contracts." Id. at 903. Rather, the solicitation indicated that past performance would be assessed based on its "logical connection with the matter under consideration;" and IGH's past performance references indicated that it had performed "numerous tasks . . . linked to numerous [solicitation] requirements." Id. at 903–04 (internal quotation omitted). Finally, the GAO found no reason to question the CO's trade-off analysis, given that "the technical factor was the most important factor" and that IGH submitted a superior technical proposal. Id. at 906–07.

**IV.     Proceedings in this Court**

On March 18, 2016, DysTech filed its complaint in this Court, along with a motion for a preliminary injunction. ECF Nos. 1–2. As it had before the GAO, DysTech questioned the CO's evaluation of IGH's past performance references, claiming that the dollar value of those contracts was "miniscule compared to the contract value [of] the current procurement." Compl. ¶ 22. Further, DysTech contended that the CO should have given it a more favorable past performance rating because "over the totality of [its] references" it had supported several branches of the military nationwide. Id. ¶¶ 24–25. DysTech also alleged that DHRA "breached the duty of good faith, fair dealing, and honest consideration" by "fail[ing] to follow the stated terms of the [solicitation] in making its award decision" and by "favoring . . . IGH's proposal by failing to downgrade it where IGH failed to properly respond to the [solicitation's] requirements." Id. ¶ 37. It requested that the Court "enjoin[] DHRA from continuing performance of any contract awarded to IGH . . . until the Agency has performed a re-evaluation of the offers submitted in response to the Solicitation." Id. at 11.

Pursuant to Rules of the Court of Federal Claims (RCFC) 24(a)(2), IGH intervened in the case on March 22, 2016. ECF No. 9. At a status conference held that day, the parties agreed to resolve the case through expedited briefing of cross-motions for judgment on the administrative record, thus obviating the need for preliminary injunctive relief. Status Conf. at 5:18–6:06 (March 22, 2016). The cross-motions have been filed and are now ripe for decision.

**DISCUSSION**

**I.     Jurisdiction**

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A bidder has a direct economic interest if the alleged errors in the procurement caused it to suffer a competitive injury or prejudice. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").

In a post-award bid protest, the protestor has suffered prejudice if it would have had a "'substantial chance'" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed.

Cir. 2006). In other words, the protestor's chance of securing the award absent the alleged error "must not have been insubstantial." Info. Tech., 316 F.3d at 1319.

Neither the government nor IGH disputes that DysTech is an "interested party" in this case. DysTech was, of course, an actual offeror for the contract in question; and, as noted above, the CO determined that DysTech was second in line for the contract award behind IGH. See AR Tab 36 at 760–61. It follows, therefore, that DysTech had a substantial chance of winning the award but for the errors it alleges.

## II. Standard for Granting Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III. Standard of Review in Bid Protest Cases

The court reviews challenges to a contract award under the same standards used to evaluate an agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest action, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). And "the protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). Further, the court "accords contracting officers an even greater degree of discretion when the award is determined based on the best value to

the agency." <u>Glenn Defense</u>, 720 F.3d at 908 (internal citations omitted); <u>see also</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir. 2013); <u>Galen Med. Assocs.</u>, 369 F.3d at 1330; <u>Banknote Corp. of Am. Inc. v. United States</u>, 365 F.3d 1345, 1355 (Fed. Cir. 2004); <u>Am. Tel. & Tel. Co. v. United States</u>, 307 F.3d 1374, 1379 (Fed. Cir. 2002); <u>Advanced Data Concepts</u>, 216 F.3d at 1058; <u>E.W. Bliss Co. v. United States</u>, 77 F.3d 445, 449 (Fed. Cir. 1996); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 958–59 (Fed. Cir. 1993). In short, an agency's contract award is "least vulnerable to challenge" when it is based on a best-value determination. <u>PlanetSpace Inc. v. United States</u>, 96 Fed. Cl. 119, 125 (2010) (citing <u>Galen Med. Assocs.</u>, 369 F.3d at 1330).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" <u>Impresa Construzioni</u>, 238 F.3d at 1332–33 (quoting <u>Latecoere Int'l, Inc. v. U.S. Dep't of Navy</u>, 19 F.3d 1342, 1356 (11th Cir. 1994)). To prevail, the agency need only articulate a "rational connection between the facts found and the choice made;" and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quotations omitted). Thus, the agency's action is vulnerable to challenge only if the plaintiff can show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Ala. Aircraft Indus., Inc.–Birmingham v. United States</u>, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting <u>State Farm</u>, 463 U.S. at 43).

## IV.   Merits

### A.   <u>Evaluation of IGH's Technical Proposal</u>

It is well-established that "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." <u>One Largo Metro, LLC v. United States</u>, 109 Fed. Cl. 39, 74 (2013) (alteration in original) (quoting <u>Beta Analytics Int'l, Inc. v. United States</u>, 67 Fed. Cl. 384, 395 (2005)); <u>see also</u> <u>E.W. Bliss Co.</u>, 77 F.3d at 449 ("[M]atters [such] as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). In this case, DysTech claims that because its proposal was assigned two strengths and no weaknesses, "under the [a]gency's stated evaluation criteria, [its] proposal should have been rated [o]utstanding." Pl.'s Mem. in Supp. of its Mot. for J. on the Admin. R. (Pl.'s Mem.) at 29, ECF No. 23. It further argues that the agency erred when it rated IGH's technical proposal "outstanding," contending that the outstanding rating assigned IGH was neither "reasonable" nor "consistent with the solicitation and evaluation criteria." <u>See</u> <u>id.</u> at 22. Both of these contentions lack merit.

As set forth above, the solicitation specified that a proposal would merit an "outstanding" technical rating if it was "complete in terms of the basic content and level of information the Government seeks" and also "exceed[ed] stated requirements, as

reflected through an innovative, comprehensive, and outstanding approach." AR Tab 2 at 74. Further, an "outstanding" proposal would demonstrate a "high probability of success and minimal risk that [the] Offeror would fail to meet the quantity, quality, and schedule requirements." Id. at 74–75.

As is readily apparent, the evaluation criteria do not establish that a proposal be rated outstanding based upon either the number of "strengths" identified by the agency or the fact that no weaknesses have been identified. As noted by the Source Selection Authority, "[w]hile [DysTech] received no weaknesses, [its] strengths were limited to the training of Employment Coordinators." AR Tab 37 at 765. This explanation for the agency's assignment of an acceptable rather than outstanding rating provides adequate justification for the agency's conclusion that DysTech's proposal, unlike IGH's, did not "exceed stated requirements as reflected through an innovative, comprehensive, and outstanding approach." See AR Tab 2 at 74. Therefore, there is no merit to DysTech's assertion that the agency's decision to assign it an acceptable rather than outstanding rating was arbitrary, capricious, or contrary to law.

There is further no merit to DysTech's argument that IGH's technical proposal "did not address multiple PWS requirements" and therefore did not merit an outstanding rating. See Pl.'s Mem. at 22. DysTech's first claim is that IGH failed to address section 2.2 of the PWS, which described the contours of FEPP's EIP component. See Pl.'s Mem. at 23; AR Tab 2 at 10. Thus, section 2.2 explained that EIP "utilizes a high-tech/high-touch approach to foster employer partnerships" and that it "delivers employment assistance to Guard and Reserve Service members via the Veterans Employment Center (VEC) website www.ebenefits.va.gov/jobs, individualized case management and participation in job fairs and Yellow Ribbon Reintegration events." AR Tab 2 at 10. According to DysTech, DHRA "did not recognize that IGH did not address PWS 2.2 in its proposal," even though it "assigned weaknesses, significant weaknesses, or deficiencies to . . . [other] offerors for failing to discuss the VEC or not demonstrating an understanding of the VEC." Pl.'s Mem. at 23.

Contrary to DysTech's argument, however, the TEB reasonably concluded that IGH's proposal did discuss the VEC and did demonstrate an understanding of its importance. Thus, although IGH's proposal did not use the term "VEC website," it identified the website by its URL—"ebenefits.va.gov"—and described it as one of the "highest priority resources" about which new employees would be trained. See AR Tab 10 at 206. The TEB reasoned that IGH's proposal "recognized the importance of the eBenefits.va.gov website by proposing to ensure that they would train all full-time staff to be able to assist Service members." AR Tab 25 at 611.

DysTech's second contention—that IGH's offer was "silent on PWS Section 5"—is equally without merit. See Pl.'s Mem. at 24. That section, titled "Reports and Information," listed several "required work reports" that the contractor was to submit at specified intervals. See AR Tab 2 at 22–24. Contrary to DysTech's contention, IGH committed in its proposal to submitting reports on a weekly and monthly basis that would "measure and report against milestone plans," AR Tab 10 at 221; and it singled out the key manager responsible for all "formal reporting to FEPP contacts as specified in the

PWS," id. at 219. Thus, the TEB reasonably concluded that IGH "satisfied the deliverables requirement from Section 5 of the PWS," because its proposal adequately "referenced reports and reporting procedures applicable to FEPP," notwithstanding that the proposal did not list the individuals responsible for the reports using the particular acronyms found in the PWS. AR Tab 25 at 611.

Third, DysTech claims that IGH's proposal did not include a plan to hire a Mobile Job Store Scheduler (MJSS). See Pl.'s Mem. at 24–25. DysTech contends that "IGH did not reference the MJSS . . . in its proposal in any way." Id. at 25. It also contends that IGH failed to discuss how persons hired for certain key positions (identified in section 4.21 of the PWS) would interact with each other and with outside agencies such as the State Department, or how those individuals would submit certain reports to DHRA. Id. at 25–26. Again, DysTech claims that other offerors were penalized if their proposals lacked this same information. Id. at 26.

These contentions also lack merit. The MJSS's duties are outlined in section 4.21.5 of the PWS, and include "[b]e[ing] knowledgeable of FEPP missions and programs," "[d]evelop[ing] an annual scheduling calendar," and "establish[ing] routine logistics coordination . . . for MJS scheduling, support, and event execution." AR Tab 2 at 21. In evaluating IGH's proposal, the TEB noted that the proposal "incorporated the MJSS duties within its discussion of how it will drive event logistics and collaboration across FEPP," and that the proposal "align[ed] with the normal primary duties of the [MJSS]." AR Tab 25 at 612. And the TEB similarly found that "the duty descriptions for the [various] positions . . . proposed by IGH . . . corresponded" to the duty descriptions set forth in section 4.21 of the PWS, observing that the TEB "did not penalize any offeror for using different names or titles for the positions so long as they would satisfy the performance requirements." Id.

Thus, the record does not support DysTech's claim that IGH failed to address several solicitation requirements that served as the basis for assigning weaknesses to other offerors. In fact it shows the opposite. Accordingly, DysTech has not shown that the agency's decision to assign IGH's technical proposal an "outstanding" rating was arbitrary, capricious, or contrary to law.

**B.    Evaluation of IGH's Past Performance**

In addition to challenging the assignment of an outstanding rating to IGH's technical proposal, DysTech's argues that the agency erred in finding that IGH's past performance references were "somewhat relevant"—i.e., that they "involved some of the magnitude of effort and complexities this solicitation requires." See AR Tab 2 at 75. According to DysTech, this error led the agency to improperly assign IGH a "satisfactory confidence" rating based on IGH's satisfactory performance of those recent and "somewhat relevant" contracts. Pl.'s Mem. at 11. In DysTech's view, "IGH's [references] could not have received any rational rating under past performance higher than Not Relevant because IGH has never performed the work required under the RFP." Id.

As with an agency's evaluation of a technical proposal, courts give "the greatest deference possible . . . to the agency" when reviewing an agency's evaluation of an offeror's past performance. Sci. and Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 65 (2014) (quoting Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004)); see also Glenn Defense, 720 F. 3d at 911 (observing that an agency's past performance evaluation is "owed deference as it is among 'the minutiae of the procurement process,' which [the] court 'will not second guess.'" (quoting E.W. Bliss Co., 77 F.3d at 449)).

Here, the solicitation set a relatively low bar for finding an offeror's performance on another contract "somewhat relevant." As noted, under the solicitation, relevancy is indicated where the performance of the prior contract was recent and has a "logical connection" with performance under the solicitation. AR Tab 2 at 73. A "somewhat relevant" reference is one for which "[p]resent/past performance effort involved some of the magnitude of effort and complexities this solicitation requires." Id. at 75 (emphasis supplied). A "not relevant" rating, by contrast, would mean that the "[p]resent/past performance effort did not involve any of the magnitude of effort and complexities this solicitation requires." Id. (emphasis supplied).

In this case, the agency provided adequate explanation to support its conclusion that IGH's past performance references were "somewhat" rather than "not" relevant. Thus, to determine the relevancy of IGH's past performance references, the TEB analyzed each of the references in detail. See AR Tab 24 at 603–04. In each instance, the TEB found that IGH had performed tasks that were similar in kind and complexity to those required by the solicitation, while also acknowledging that the "magnitude of effort," when measured in terms of the dollar amount of the contract, was significantly smaller than that which would be required to fulfill the requirements of the present solicitation. See id. (listing specific examples of the "[s]imilarity of work" and "numerous like tasks" performed during IGH's past contracts).

For example, the TEB found "somewhat relevant" to IGH's ability to perform the requirements of this solicitation its performance of an Army Community Services Contract. See id. at 603; AR Tab 36 at 739. While the TEB acknowledged that the dollar amount of that contract was much smaller, it concluded that—consistent with the tasks required to perform the solicitation's requirements—the Army contract also included management of web content, providing support outside of duty hours, knowledge of DTS (the Defense Travel System) and USERRA (the Uniformed Service Employment Rights and Restoration Act), and direct support of employers, National Guard and Reserve members, and ESGR volunteers. AR Tab 24 at 603. "Further," the TEB observed, under the Army Community Services contract, IGH has "provided direct support to ESGR, YRRP, and EIP programs." Id.

IGH's contract with HUD for Grant Management Support was also "somewhat relevant" because, among other reasons, "it requires familiarity with the JFTR (Joint Federal Travel Regulations) and DTS, it consults USERRA, it includes quality assurance, [and] the effort crosses all 50 states servicing Guard and Reserve." Id. at 603–04; see also AR Tab 36 at 739. Finally, IGH's contract with the VA involving rural veterans coordination included relevant tasks such as providing assistance in the development of

an annual budget and spending plan and in outreach to Guard and Reserve in rural areas, as well as partnering with employment assistance agencies. AR Tab 24 at 604; see also AR Tab 36 at 739.

The agency also explained and documented why it assigned IGH a performance confidence rating of "satisfactory confidence." Under the solicitation, a rating of "satisfactory confidence" meant that "[b]ased on the offeror's performance record, the Government has an expectation that the offeror will successfully perform the required effort." AR Tab 10 at 75. In assigning IGH a rating of "satisfactory confidence," the CS reviewed the TEB's report along with information from the PPIRS and questionnaires completed by the references. AR Tab 35 at 705. The CS explained that "[a]lthough the magnitude of the references are below that of the [solicitation's] requirement[s], IGH has performed efforts that collectively involve much of the complexities of the [solicitation's] requirement[s]." Id. The "positive feedback [IGH] received on their references" led the CS to have "an expectation that IGH will successfully perform the [solicitation's] requirement[s]." Id. Accordingly, under the CS's analysis, a rating of "satisfactory confidence" was warranted; and the CO subsequently relied on the CS's analysis when conducting the trade-off analysis. See AR Tab 36 at 748, 761–62.

DysTech does not seriously contest the agency's determination that at least some of the work IGH performed on its recent contracts was similar in complexity to at least some of the work required under the solicitation. Nonetheless, it faults the agency for not finding that IGH's references were "not relevant" at all in light of their relatively low dollar value.[3] See Pl.'s Mem. at 11.

This objection amounts to nothing more than a disagreement with the balance struck and the conclusion reached by the agency in the exercise of its discretion. Nothing in the solicitation set a bar on the dollar value of a recent contract, below which it would be considered irrelevant. In fact, the contract was a 100% set aside for small businesses. See AR Tab 1 at 2. Further, as GAO recognized in rejecting a similar argument made before it, the notion that the relative dollar value of past contracts would control a determination of their relevance "would read out of the solicitation the agency's more specific definition of relevancy: performance with a 'logical connection with the matter under consideration'—the FEPP tasks." See AR Tab 47 at 903 (quoting AR Tab 2 at 73). As GAO observed, the argument "would also ignore the past performance questionnaire's request for information regarding the 'scope of work and complexity/diversity of tasks performed,' the 'skills/expertise required,' and relevancy." Id. (quoting AR Tab 2 at 77).

Further, the "somewhat relevant" rating IGH's references received was the second-lowest rating available, behind "very relevant"—"[p]resent/past performance

---

[3] In its motion, DysTech also advanced an argument that IGH's proposal improperly relied on "the apparent past performance of its proposed subcontractors." See Pl.'s Mem. at 11. It pointed to no evidence in the record to support this claim, however, and counsel for DysTech abandoned this claim at oral argument. Oral Argument at 14:06–47 (June 22, 2016).

effort involved essentially the same magnitude of effort and complexities this solicitation requires"—and "relevant"—"[p]resent/past performance effort involved much of the same magnitude of effort and complexities this solicitation requires." See AR Tab 2 at 75. The only other available rating was "not relevant"—"[p]resent/past performance effort did not involve any of the magnitude of effort and complexities this solicitation requires"—and the agency reasonably concluded that IGH's references deserved a higher rating based on the "similarity of work" and "numerous like tasks" IGH had performed in the course of those contracts. See AR Tab 24 at 603–04; AR Tab 35 at 705.

In sum, the agency reasonably exercised its discretion when it rated IGH's past performance references as "somewhat relevant" and gave it a performance confidence rating of "satisfactory confidence." Accordingly, the agency did not err in its past performance evaluation.

### C.   Trade-Off Analysis and Best Value Determination

Finally, DysTech questions the agency's trade-off analysis and its decision that IGH's offer represented the best value to the government. "Procurement officials," however, "have substantial discretion to determine which proposal represents the best value for the government." Glenn Defense, 720 F.3d at 908 (quoting E.W. Bliss Co., 77 F.3d at 449). Thus, "[w]here agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009) (citing E.W. Bliss Co., 77 F.3d at 449). And to demonstrate the proper exercise of discretion, the agency need only "document[] its final award decision and include[] its rationale for any business judgments and tradeoffs made." Id.; see also Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 390 (2003) ("Ultimately, th[e] court's task is to ensure that the contracting officer examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting State Farm, 463 U.S. at 43)); FAR § 15.101-1(c) (when an agency conducts a trade-off process, "[t]he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented").

DysTech asserts that the CO "articulated no basis" for choosing IGH's higher-priced offer over its lower-priced one, and, relatedly, that the CO failed to "identify and describe the specific advantages" that made IGH's proposal superior to DysTech's. See Pl.'s Mem. at 29. These assertions ignore the explanation found in the CO's award rationale, which clearly identifies the features of IGH's proposal that the CO "deemed advantageous" and that "exceed[ed] the government's requirements." See AR Tab 36 at 761–62. Specifically, the CO observed that staff members would receive "face to face training" that would give them "a better understanding of their roles and responsibilities, thereby providing better support to their customers;" that IGH would "collect regular feedback following ITIL, ISO, and PMBOK best practices in an attempt to facilitate continuous improvement;" that IGH's proposed employee screening process would "ensure that FTS are fully proficient in the applications and systems the government requires;" and that IGH's proposed advisory board, which would "consist of senior leadership from each of the teaming partners," would "provide an additional resource to

meet the needs of reserve component service members who require specialized assistance." Id.

Likewise, in comparing DysTech's proposal with IGH's proposal, the SSA reported that DysTech's strengths "were limited to the training of Employment Coordinators," whereas IGH's strengths "were evident along the program's continuum." AR Tab 37 at 765. The SSA highlighted the portions of IGH's proposal describing "the manner by which employees were vetted" and "their individually focused development and retention." Id. She also noted that IGH planned to "employ continuous improvement tools and practices to evolve with the program's dynamic nature," and that the "dedicated advisory board and clear articulation and integration of each of the FEPP's distinct, yet related services" exceeded the government's requirements. Id. at 765–66. In her view, "[e]ach of IGH's strengths will have beneficial effects across the FEPP program compared to the narrow focus of positive qualities presented by the other offerors." Id. at 766. Thus, she concluded, "IGH's superior proposal warrant[ed] a price premium, particularly [because] IGH's proposal [was] the sole technically superior proposal, and so greatly exceeded all of the acceptably rated proposals." Id. at 767.

These detailed explanations more than suffice to document the agency's proper exercise of discretion, especially because the technical and past performance factors, "when combined, [were] significantly more important than cost or price." See AR Tab 2 at 74; see also Structural Assocs., Inc./Comfort Systems USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 749 (2009) (rejecting plaintiff's argument that the agency should have selected its lower-priced, technically inferior proposal where solicitation specified that non-price factors were significantly more important than price). Accordingly, the agency did not err in conducting the best-value analysis and awarding the contract to IGH.

## CONCLUSION

For the reasons discussed above, the government's and the Intervenor's cross-motions for judgment on the administrative record are **GRANTED**, and DysTech's cross-motion for judgment on the administrative record is **DENIED**. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge